HARDY v MONSANTO ENVIRO-CHEM SYSTEMS, INC

Docket No. 63385. Argued March 4, 1980 (Calendar No. 6).—Decided August 23, 1982.

Ruth Hardy, administratrix of the estate of Robert G. Hardy, deceased, brought an action against Monsanto Enviro-Chem Systems, Inc., Leonard Construction Company, and J & L Roofing Company for the wrongful death of Robert G. Hardy as a result of injuries suffered in the course of his employment on a construction project. Monsanto had entered into a contract to construct a wastewater treatment facility, and delegated responsibility for the actual construction to its subsidiary, Leonard. Leonard, in turn, entered into a subcontract with J & L for roofing work. J & L engaged the J. Klanderman Company, Robert Hardy's employer, to do the sheet-metal work on the project. Mr. Hardy was killed in a fall through an uncovered opening in a roof at the construction site, 27 feet above the ground. The plaintiff alleged that the defendants had a duty to implement reasonable safety measures to protect the workers

REFERENCES FOR POINTS IN HEADNOTES

[1-3, 6-8, 12] Am Jur 2d New Topic Service, Comparative Negligence §§ 1, 29.
    53 Am Jur 2d, Master and Servant § 230.
    57 Am Jur 2d, Negligence § 125.
    Modern development of comparative negligence doctrine having applicability to negligence actions generally. 78 ALR3d 339.
[4] 57 Am Jur 2d, Negligence §§ 13, 249.
[5] 57 Am Jur 2d, Negligence §§ 101-107, 245, 246, 259.
[6-12] 57 Am Jur 2d, Negligence § 50.
[9] 57 Am Jur 2d, Negligence §§ 115, 120, 121.
[10] 57 Am Jur 2d, Negligence § 123.
[11] 57 Am Jur 2d, Negligence §§ 288, 303.
[13] 57 Am Jur 2d, Negligence §§ 247, 248.
[14] 57 Am Jur 2d, Negligence §§ 101-107.
[15] Am Jur 2d New Topic Service, Comparative Negligence § 56.
[16] 13 Am Jur 2d, Building and Construction Contracts § 141.
    41 Am Jur 2d, Indemnity § 5.
[17] 41 Am Jur 2d, Indemnity §§ 15-18.
[18] 58 Am Jur 2d, New Trial § 148 *et seq.*

at the construction site and breached that duty. Leonard filed a cross-claim against J & L, seeking indemnity.

During trial in the Kent Circuit Court, John T. Letts, J., the defendants were permitted to raise the defense of the contributory negligence of the decedent. The court later charged the jury that a finding that the decedent was guilty of "ordinary" negligence would operate as a complete bar to recovery, and further instructed the jury that a violation by the decedent of the labor safety act through his "ordinary" negligence, if found to be a proximate cause of his injuries, constituted contributory negligence as a matter of law.

J & L's motion for a directed verdict on Leonard's cross-claim for indemnity was denied.

Following trial, the jury returned a verdict in favor of all defendants, five of the six jurors indicating when polled that they had concluded that, while the defendants had been negligent, the decedent also had been negligent. The Court of Appeals, D. F. Walsh, P.J., and J. H. Gillis, J. (T. M. Burns, J., dissenting), affirmed in an unpublished per curiam opinion (Docket No. 77-726). The plaintiff appeals; J & L cross-appeals.

In an opinion by Justice Ryan, joined by Chief Justice Coleman and Justices Kavanagh and Fitzgerald, the Supreme Court *held:*

The defense of contributory negligence as a total bar to recovery is not available in a negligence action such as this for failure to provide adequate safety devices on the job, but the defense of comparative negligence is available, assuming that any evidence of the plaintiff's negligence exists. The defense of comparative negligence is not limited to negligence not involving "safety devices", but applies to all workplace negligence. Violation of the labor safety act by the decedent constitutes a prima facie case of negligence, rather than negligence as a matter of law. Leonard may attempt to show a right to indemnification under Illinois law on a theory of breach of contract.

1. The defense of comparative negligence serves not to undermine, but to enhance the goal of safety in the workplace. A contractor can never entirely avoid liability and thus escape a duty of care where the defense can be raised. This rule provides no strong financial incentive for a contractor to breach the duty to undertake reasonable safety precautions; rather, it rewards safety-conscious contractors. The rule does provide some financial incentive to the worker to act in a reasonable and prudent manner because he may be held answerable for his safety-related behavior.

2. Comparative negligence should not be barred as a defense

in a case involving a missing safety device which a worker has not wilfully removed. Where the worker is fully aware of a missing safety device, he should be held answerable for his negligent behavior. To the extent that the worker's behavior conforms to that of a reasonably prudent worker under all the circumstances, a trier of fact may consider any "ordinary inadvertence" and find him free from negligence. However, to the extent that "ordinary inadvertence" is a mere euphemism for the worker's negligence, it should reduce his recovery. Application of the rule of comparative negligence to all instances of workplace negligence, and not only to cases not involving safety devices, satisfies the policies announced by the Supreme Court and encourages safer behavior by contractors and workers. A unitary approach under which the worker and the contractor are charged with the duty to act reasonably under all the circumstances is preferable.

3. Upon retrial, the issue should not be limited to the amount of damages. While five of the six jurors found the defendants to be negligent, it was not specified whether the negligence involved the failure to provide adequate safety devices or some other negligent act or omission. Sufficient evidence was presented to justify an instruction under the labor safety act in effect at the time of the worker's death. The trial court should instruct the jury that a violation of the statute constitutes a prima facie case of negligence, rather than negligence as a matter of law. In addition, the Court does not define the word "wilfully" as used in the now-repealed statute, but leaves it to the trial court to decide in the first instance which of the parties' proposed instructions accurately presents the law on this point.

4. The Court agreed with Justice Moody's reasoning and result on the issue of Leonard Construction Company's claim for indemnification, and the case is remanded for trial on that claim also.

Justice Moody, joined by Justices Williams and Levin, would hold that the defense of comparative negligence is not available in this case.

1. The trial court erred in instructing the jury that a finding of "ordinary" contributory negligence on the part of the decedent in moving a skylight hole cover which had been intended as a safety device would operate as a complete bar to recovery by the plaintiff. On the facts presented, the jury reasonably could have concluded that the defendants' failure to supply

adequate safety devices was the cause in fact of the decedent's injuries.

2. Leonard, as general contractor, had a duty to take reasonable steps within its supervisory authority to alleviate the danger posed to workmen by the roof openings. Sufficient evidence was presented to support the conclusion that, as a matter of law, Leonard did not discharge its duty. Whether Leonard acted reasonably by providing adequate safety devices or implementing adequate safety programs or by requiring J & L to do so is a question of fact.

3. J & L, pursuant to the terms of its contract with Leonard, assumed the duty to provide adequate safety devices to prevent injury to workmen at the project site, and may be held to answer for its own failure to perform its contractual obligations. J & L shared control over the allegedly inadequate safety devices with Leonard, and did not have an unqualified right to rely on Leonard to discharge J & L's duty of care in maintaining the devices in the common work area. Sufficient evidence was presented for the jury to conclude that J & L breached its duty to the decedent to implement a safety program to resecure covers removed during the roofing.

4. The doctrine of comparative negligence should not be applied to reduce the recovery of a worker injured because of a breach by a contractor of the duty to provide adequate safety devices or to implement adequate safety programs except where there is evidence that the worker unreasonably altered, dismantled, or failed to use an otherwise adequate safety device. Comparative negligence as a partial bar to recovery by a plaintiff whose negligence or fault contributed to his injury replaced the complete bar which previously resulted upon a finding of contributory negligence. Where a contractor is obligated to provide adequate safety devices to guard against a worker's negligence and fails to do so, the worker's negligence which would not have resulted in injury had the devices been provided is legally irrelevant. The defense of the worker's negligence was rejected as a matter of policy prior to the adoption of the comparative negligence doctrine. The adoption of that doctrine did not create liability where none previously existed. Application of the doctrine would subvert the intent of the Legislature in enacting the safety statute and would undercut the goal of fostering worker safety.

5. The trial court erred in instructing the jury relative to the provision of the labor safety act proscribing a worker's purposeful removal of a safety device which he realized was a safety

device from a common work area without a reasonable excuse. While the court had the discretion to instruct the jury on the provisions of the statute, its charge to the jury regarding the standard of care set forth in the statute failed to distinguish between the purposeful conduct proscribed by the statute and ordinary inadvertence. Conduct is not purposeful if it is accidental, and intentional conduct is not purposeful if a reasonable worker would not have known both that a device is a safety device and that risk of injury or death may result from its removal or alteration. The court further erroneously instructed the jury that a violation of the statute, if found to have been a proximate cause of the decedent's injury, constituted contributory negligence as a matter of law. The statute was intended to foster accident prevention in the workplace. Under the statute, only a purposeful violation of the statute could be raised by a contractor as a valid defense to an alleged breach of the duty to supply adequate safety devices, and if the jury concluded that the violation was a proximate cause of the injury, the worker's negligence could be compared with the contractor's.

6. The agreement between Leonard and J & L provides that its terms would be construed under the law of Illinois. Leonard concedes that under applicable Illinois law an express indemnity clause relating to an indemnitee's own negligence is unenforceable, and is considered to have waived its claim under that clause. Nor is Leonard entitled to common-law indemnity from J & L. Common-law indemnity is available where a wrongdoer's negligence is passive; however, on the facts presented, Leonard could be found negligent only as a result of a breach of its duty to provide adequate safety devices and programs, and such negligence would be active. Finally, Leonard claims indemnity on the theory that J & L breached its contractual duty to comply with safety laws and codes. Leonard did not show that such a ground for indemnity is recognized under Illinois law, but since the case must be retried, Leonard may present further evidence and authority to support this theory.

7. Retrial should not be limited to the issue of damages. The issue of liability was not clearly determined in the trial court. Should the plaintiff prevail, Leonard may be able to demonstrate its right to indemnity from J & L based on J & L's breach of contract.

Reversed and remanded for a new trial.

OPINION OF THE COURT

1. NEGLIGENCE — SAFETY DEVICES — GENERAL CONTRACTORS — COMPARATIVE NEGLIGENCE.

The defense of comparative negligence is available to a contractor in a case involving negligence in the failure to provide an adequate safety device in the workplace where any evidence of a worker's negligence exists.

2. NEGLIGENCE — SAFETY DEVICES — GENERAL CONTRACTORS — COMPARATIVE NEGLIGENCE.

The doctrine of comparative negligence applies to all instances of workplace negligence, and not only to cases not involving safety devices.

3. NEGLIGENCE — SAFETY DEVICES — COMPARATIVE NEGLIGENCE.

The defense of comparative negligence is not barred in a case involving a missing safety device which a worker has not wilfully removed; where the worker is fully aware of a missing safety device, he should be held answerable for his negligent behavior.

4. NEGLIGENCE — COMPARATIVE NEGLIGENCE — ORDINARY INADVERTENCE.

The trier of fact may find an injured worker to be free from negligence even though his behavior involved "ordinary inadvertence" where the behavior conforms to that of a reasonably prudent worker under all the circumstances; however, to the extent that "ordinary inadvertence" is a mere euphemism for the worker's negligence, it should reduce his recovery.

5. NEGLIGENCE — SAFETY DEVICES — STATUTES.

Violation of the provision of the labor safety act which proscribed the wilful removal of a safety device in a workplace by a worker constitutes a prima facie case of negligence rather than negligence as a matter of law (MCL 408.853; MSA 17.49[3], since repealed, 1974 PA 154).

OPINION DISSENTING IN PART BY BLAIR MOODY, JR., J.

6. NEGLIGENCE — SAFETY DEVICES — GENERAL CONTRACTORS — SUBCONTRACTORS.

A general building contractor has a duty to take reasonable steps within his supervisory authority to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workers, including providing adequate safety equipment or implementing adequate safety programs or requiring subcontractors to provide such equipment or implement such programs.

7. NEGLIGENCE — SAFETY DEVICES — GENERAL CONTRACTORS — SUB-
    CONTRACTORS.

A general building contractor is not relieved from his duty to
provide adequate safety equipment within his supervisory and
coordinating authority by the absence of any conspicuous fail-
ure by a subcontractor to supply safety equipment for his
employees; such an absence is only a factor to be considered by
a trier of fact in determining whether the general contractor
reasonably complied with his duty.

8. NEGLIGENCE — SAFETY DEVICES — GENERAL CONTRACTORS — SUB-
    CONTRACTORS.

A provision in a subcontract requiring written approval of the
general contractor prior to a subcontractor's subletting work
will not relieve the general contractor from his duty to guard
against dangers posing a high degree of risk to a significant
number of workers in common work areas occupied by employ-
ees of a subcontractor whom he has not approved where the
general contractor is aware of the subcontractor prior to com-
mencement of any work by the subcontractor and employees of
another, approved, subcontractor occupy the same area.

9. NEGLIGENCE — SAFETY DEVICES — GENERAL CONTRACTORS — SUB-
    CONTRACTORS — ASSUMPTION OF DUTY.

A subcontractor who assumes a duty under his contract with the
general contractor to guard against dangers in common work
areas posing a high degree of risk to a significant number of
workers must perform his contractual obligation with ordinary
care, and failure so to perform may support a cause of action
against the subcontractor as well as the general contractor for
injuries to workers resulting from inadequate safety precau-
tions.

10. NEGLIGENCE — SAFETY DEVICES — GENERAL CONTRACTORS —
    SUBCONTRACTORS.

A subcontractor does not have an unqualified right to rely on the
efforts of the general contractor in the discharge of the subcon-
tractor's contractually assumed duty to maintain adequate
safety equipment in common work areas.

11. NEGLIGENCE — SAFETY DEVICES — GENERAL CONTRACTORS —
    CONTRIBUTORY NEGLIGENCE.

Contributory negligence is no defense to failure by a contractor to
provide adequate safety equipment in common work areas
where the failure is causally connected to a worker's injury.

12. NEGLIGENCE — SAFETY DEVICES — GENERAL CONTRACTORS — COMPARATIVE NEGLIGENCE.

*The doctrine of comparative negligence may not be applied to claims involving breach of a contractor's duty to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workers as a total or a partial bar to recovery by an injured worker except where there is evidence that the worker unreasonably altered, dismantled, or failed to use an otherwise adequate safety device; the ability of a worker to avoid the risk of harm posed by absent or inadequate safety devices is inferior to the contractor's, and such application would substantially undercut the primary goal of fostering worker safety by encouraging the provision of necessary safety devices.*

13. NEGLIGENCE — STANDARD OF CARE — STATUTES — COMMON LAW — DISCRETION.

*A trial court retains ultimate discretion whether to apply a statutory standard of care in a civil action in lieu of a common-law standard absent specific language in the legislation creating civil liability; in determining which standard to apply, the court should look to the statute to ascertain whether application of the statutory standard of care would further the legislative intent.*

14. NEGLIGENCE — SAFETY DEVICES — STANDARD OF CARE — STATUTES — ORDINARY NEGLIGENCE.

*The provision of the labor safety act which proscribed wilful removal of a safety device in a workplace by a worker was aimed at fostering accident prevention in the workplace and not at creating civil liability in the worker for inadvertence or for intentional removal of an object which the worker did not know was a safety device (MCL 408.853; MSA 17.49[3], since repealed, 1974 PA 154).*

15. NEGLIGENCE — SAFETY DEVICES — JURY INSTRUCTIONS — COMPARATIVE NEGLIGENCE — STANDARD OF CARE.

*A trial court, in an action by a worker for damages resulting from injuries received because of the absence of a safety device or an inadequate safety device in the workplace, may instruct the jury that a finding that the worker violated a statutory standard of care without excuse and that the violation was the proximate cause of his injuries constitutes a prima facie case of negligence where the instruction is supported by the evidence, the statute is designed to prevent the harm which occurred, and the standard of care involves conduct in which the worker*

*unreasonably altered, dismantled, or failed to use an otherwise adequate safety device, and, if the jury concludes that the worker is responsible for such causal misconduct, his negligence may be compared with that of the defendant in assessing damages.*

16. Conflict of Laws — Construction Contracts — Indemnity.

A clause in a construction contract which provides that the terms of the agreement will be construed in accordance with the laws of a foreign state will be enforced against the drafter absent a showing that the clause may not be enforced, and where the law of the foreign state precludes enforcement of express indemnity provisions in construction contracts relating to the negligence of an indemnitee that law will control and render the indemnity provision unenforceable.

17. Indemnity — Common-Law Indemnity — Negligence.

Common-law indemnity may be available to a party liable to an injured party where the liability arises by reason of his relation to another wrongdoer or is imposed by operation of law in the absence of personal fault or causal negligence or where the wrongdoer seeking indemnity is guilty merely of passive negligence.

18. New Trial — Damages.

Generally, a remand for a new trial limited to the determination of damages will not be ordered absent a clear indication of liability.

*Murray & Mroz* (by *Terry J. Mroz* and *James R. Hulbert)* for plaintiff.

*Wheeler, Upham, Bryant & Uhl* (by *Buford A. Upham* and *Susan B. Flakne)* for defendants Monsanto Enviro-Chem and Leonard Construction Co.

*Rhoades, McKee & Boer* (by *Michael W. Betz* and *Ben T. Liu)* for defendant J & L Roofing Co.

Ryan, J. In this case we are required to determine the effect of the doctrine of comparative negligence[1] on our decisions in *Funk v General*

---

[1] Adopted in *Placek v Sterling Heights,* 405 Mich 638; 275 NW2d 511 (1979).

*Motors Corp,* 392 Mich 91; 220 NW2d 641 (1974), and *Tulkku v Mackworth Rees Division of Avis Industries, Inc,* 406 Mich 615; 281 NW2d 291 (1979).[2] Since the defense of comparative negligence serves not to undermine but to enhance safety in the workplace, we are of the view that comparative negligence is available as a defense in those cases where *Funk* and *Tulkku* formerly prohibited the application of the contributory negligence defense. We conclude that negligence in the failure to provide an "adequate safety device" in the workplace is therefore subject to the comparative negligence defense, assuming that any evidence of the plaintiff's negligence exists. The verdict in favor of the defendants is reversed and the cause remanded for retrial under the principles of comparative negligence. *Placek v Sterling Heights,* 405 Mich 638; 275 NW2d 511 (1979).

I

The facts of this case are set forth in full and accurate detail in Justice MOODY's opinion, to which reference is invited. The plaintiff-appellant argues that the jury should not have been instructed that contributory negligence was a defense to the claim that the defendant construction contractors negligently installed or maintained safety devices for the protection of construction workers at the work site.

Although the precise limits of this Court's opinion in *Funk, supra,* are unclear,[3] we concur with

---

[2] This question was expressly reserved by the Court in *Tulkku,* 623.

[3] At the extreme, *Funk* and *Tulkku* could be read to abolish the defense of contributory negligence in *all* actions where personal injury results from the defendant's negligence. *All* potential negligence defendants have a common-law or legislatively imposed duty to take reasonable precautions for the safety of others. If *any* negligence

the result reached by Justice MOODY in parts I-III of his opinion. Under *Funk,* the defense of contributory negligence is unavailable when a construction worker alleges negligence in the failure to provide adequate safety devices on the job. The plaintiff in this case presented sufficient, albeit weak, evidence upon which the jury might have concluded that the plywood sheets covering the openings in the roof were "safety devices" which were negligently installed or maintained. Absent a reconsideration of the *Funk* doctrine, the plaintiff would be entitled to a new trial on the negligence claim, without the defense of contributory negligence.[4]

However, the defense of contributory negligence as a total bar to recovery would be unavailable upon retrial in any event in light of *Placek, supra.* We must therefore decide whether the *Funk* policy of promoting safety in the workplace would be undermined or enhanced by the application of the principles of comparative negligence.

## II

In *Funk,* this Court found the total bar of contributory negligence to be inconsistent with the public policy of promoting safety in the workplace. The Court refused to allow a general contractor and a landowner to "avoid" liability "by pointing to the concurrent negligence of the injured worker

---

defendant "could avoid this duty by pointing to the concurrent negligence of the [plaintiff] * * * the beneficial purpose of the statute [or common law] might well be frustrated and nullified". *Funk,* 113-114, quoting *Koenig v Patrick Construction Corp,* 298 NY 313, 318-319; 83 NE2d 133 (1948).

[4] If the plaintiff's decedent had been "grossly negligent", a defense would be available. See *Funk,* 113, fn 18, citing *Bowman v Redding & Co,* 145 US App DC 294; 449 F2d 956 (1971).

in using the [unsafe] equipment". *Funk,* 113-114, quoting *Koenig v Patrick Construction Corp,* 298 NY 313, 318-319; 83 NE2d 133 (1948). Before *Funk,* the contractor could *entirely* avoid liability by convincing the finder of fact that the plaintiff was even 1% negligent. Apparently it was feared that some contractors might succumb to the temptation of employing skilled defense counsel instead of adequate safety devices. As the Court noted in *Tulkku,* 622:

"To allow defendants in this case to invoke the protection of the contributory negligence doctrine would be tantamount to subverting the very safety concerns that the *Koenig* and *Funk* courts extolled as of paramount importance. Such a position might allow a manufacturer to *escape* its duty of due care * * *:

" 'It would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in *no liability* for the very injury the duty was meant to protect against.' " Quoting *Bexiga v Havir Mfg Corp,* 60 NJ 402, 412; 290 A2d 281 (1972). (Emphasis added.)

In stark contrast, the defense of comparative negligence never allows a contractor to entirely "avoid" liability and thus "escape" the duty of due care. Under *Placek,* the defendant must pay the full percentage of damages caused by his negligence. We do not find this partial defense "anomalous" as does our brother; quite the contrary, it would be "anomalous" to hold a defendant liable for damages in excess of the amount causally related to his negligence.[5] The comparative negli-

---

[5] Admittedly, the prospect of paying an additional arbitrary penalty above and beyond damages proximately caused by one's own negligence might provide an increased incentive to prevent accidents. But the proposed penalty is in inverse proportion to the defendant's culpability, since the 1% negligent defendant pays a hundredfold penalty while the 100% negligent defendant pays no penalty at all.

gence defense does not provide a strong financial incentive for contractors to breach the duty to undertake reasonable safety precautions.

Our colleague asserts that a worker's recovery should not be reduced by his own comparative negligence when he works under dangerous conditions, since "considering the current state of the economy" it "would be unrealistic to conclude that workers have a choice not to work". Unfortunately, some workers are faced with the ultimatum "[i]f you don't want to work up in the steel, go home". *Funk,* 113. If a worker, acting reasonably under all the circumstances, would continue to work under the dangerous conditions, then the trier of fact could not conclude that the worker's recovery should be reduced, since the worker by definition was not negligent. On the other hand, at some point a worker must be charged with *some* responsibility for his own safety-related behavior. If a worker continues to work under extremely unsafe conditions when a reasonable worker under all the facts and circumstances would "take a walk", the trier of fact might appropriately reduce the plaintiff's recovery under comparative negligence. Comparative negligence enhances the goal of safety in the workplace under these conditions, since it gives the worker some financial incentive to act in a reasonable and prudent fashion.

The comparative negligence rule also enhances safety in the workplace by rewarding safety-conscious contractors. Undoubtedly, some contractors allow workers to refuse to work without fear of

---

Conversely, the more negligent the plaintiff, the greater his windfall recovery. The Court should not attempt to impose administrative penalties for safety violations under the guise of administering tort remedies. The Legislature has already enacted such an administrative scheme of inspections and fines under MIOSHA. See MCL 408.1001 *et seq.;* MSA 17.50(1) *et seq.*

reprisal until dangerous conditions are reported and corrected.[6] Yet our colleague's approach treats such a "safe" company identically with an "unsafe" company and prevents the safe company from reducing its damages despite a plaintiff's flagrant violation of company safety policy. The irrebuttable presumption that all contractors force workers to work under hazardous conditions might well become a grim self-fulfilling prophecy if we refuse to encourage safety-conscious contractors under the doctrine of comparative negligence.

Much the same response is appropriate to the comment that workers often become conditioned to working in dangers and deal with them prudently: continuing to work under those conditions would not constitute negligence on the part of the worker. Further, the contractor-defendant has little incentive to prove that the conditions were so dangerous that the plaintiff should have refused to work, since such an approach will probably increase rather than decrease the defendant's liability under comparative negligence. This is in contrast to the contributory negligence rule, which encouraged such a defense strategy.

In *Tulkku,* we noted that many workers rely on the effectiveness of what appears to be adequate safety equipment. In that case, the worker relied upon a four-palm-button switch that proved to be defective. Such reasonable reliance, absent proof that reasonably prudent press workers do not rely on the device, is not evidence of negligence; thus, no contributory negligence instruction should have been given in *Tulkku* because the defendant presented no evidence of the plaintiff's negligence. The *Tulkku* result would therefore remain the

---

[6] Such a salutary policy might be adopted unilaterally, or under the terms of a collective-bargaining agreement.

same even after the adoption of comparative negligence, since the worker "cannot and should not be required to temper his or her behavior because of a defect about which the [worker] has no awareness". *Tulkku*, 622. Suppose, however, that the press in *Tulkku* cycled after only three buttons were pushed, but no one was injured. A worker continuing to use the machine and receiving injuries the second time the switch fails *should* be answerable for his or her negligent behavior because the worker *is* fully aware of the defect. Yet our brother's opinion would hold exactly the opposite; the defense of comparative negligence would be unavailable in that situation because the worker has not "wilfully" removed a safety device.

Next, our colleague argues that a worker's recovery should not be reduced because of his or her "ordinary inadvertence". To the extent that the plaintiff's behavior conforms to that of a reasonably prudent worker under all the circumstances (even reasonably prudent workers act as plaintiff did because of job pressures, monotony, and attention to details of their work), the trier of fact is free to find the plaintiff free from negligence. To the extent, however, that "ordinary inadvertence" is merely a euphemism for a worker's negligence, it should reduce a worker's recovery. Until today, the notion that "mere inadvertence" should absolve persons from the effects of their negligence has been wholly foreign to our jurisprudence.[7] We see no logical reason why it should immunize this

---

[7] The automobile operator who crosses the center line and crashes head-on into another vehicle cannot claim as a defense "mere inadvertence" due to "the monotony of the task". The surgeon who operates on the wrong leg may do so "inadvertently" due to "job pressures". The pedestrian who crosses against the traffic light is negligent even if he did so "inadvertently" while thinking about the details of his work back at the office.

particular class of plaintiffs from the defense of comparative negligence even if, as appears to be the case, we are observing the genesis of a new jurisprudence to be called "safety device" law.

Finally, it is argued that "in most instances" the worker's negligence will occur later than the defendant's negligence, making it "difficult" for the jury to accurately arrive at the correct percentage of relative fault. First, no empirical data supports the speculation that in "most" workplace accidents the worker's negligence happens last and understandably no authority is cited for it. Intuitively, it would seem that in "most" cases, as in *Funk* and *Tulkku,* the contractor's failure to provide an adequate safety device is probably a continuing omission which is concurrent with the employee's conduct that produces the injury. Secondly, our brother's opinion would abolish comparative negligence even in those cases where the contractor's negligence is "last" and the worker's negligence is the more distant in time.[8] Thirdly, the idea that juries are not competent to make difficult allocations of proportional fault under comparative negligence is simply erroneous.[9] Finally, on the basis of the speculation that the jury will reach the wrong allocation of fault, our colleague's approach *guarantees* that recovery will not be in proportion to

[8] Suppose the plaintiff in this case negligently removed the nails and the cover from the opening on Monday. The contractor negligently failed to reinstall the cover on Tuesday, Wednesday and Thursday. On Friday, through no fault of his own, the plaintiff falls through the hole. The contractor's negligence in failing to correct the safety problem would be closer in time to the injury than the plaintiff's negligence in removing the cover.

[9] As Justice WILLIAMS wrote in his separate opinion in *Kirby v Larson,* 400 Mich 585, 646; 256 NW2d 400 (1977), "Those who argue that comparative negligence is both confusing and difficult to administer both underestimate the modern jury and misread the facts." Justices LEVIN and KAVANAGH joined Justice WILLIAMS in *Kirby;* the entire Court vindicated Justice WILLIAMS' position by adopting comparative negligence in *Placek, supra.*

fault, since if the defendant is negligent at all he pays 100% of plaintiff's damages. Truly this is a case of the cure being worse than the illness. As this Court acknowledged in *Placek*:[10]

" 'What pure comparative negligence does is hold a person fully responsible for his or her acts and to the full extent to which they cause injury. That is justice.' " 405 Mich 661.

Our colleague's approach today would hold these defendants responsible for their acts above and beyond the extent to which they cause injury. That is injustice.

## III

We also agree with the analysis and conclusion in part VII of Justice MOODY's opinion which rejects plaintiff's claim that retrial should be limited to the issue of damages. While a poll of the jury revealed that five of the six jurors found all defendants to have been negligent, we do not know whether defendants' negligence was the failure to provide adequate "safety devices" or some other negligent act or omission such as the alleged failure to "adequately supervise and coordinate the activities of workmen on the roof". Since the failure to adequately supervise was "ordinary negligence" and not "safety device negligence", under our brother's analysis the contributory negligence instruction would have been proper as to this claim; similarly, on retrial, comparative negligence will be available as a defense to this claim.

---

[10] See also *United States v Reliable Transfer Co, Inc,* 421 US 397, 406; 95 S Ct 1708; 44 L Ed 2d 251 (1975), adopting comparative negligence in the law of admiralty: "That a vessel is primarily negligent does not justify its shouldering all responsibility".

However, as noted, we do not limit the defense of comparative negligence to negligence not involving "safety devices". While that ambiguous and abstruse term was utilized in *Funk* and again in *Tulkku,* nothing in either opinion suggests a compelling reason why this apparently new subspecies of negligence should be treated differently than any other type of negligence. Indeed, in *Funk,* the Court noted that the defendants failed to give the plaintiff a "safety indoctrination"; yet that omission can hardly be forced into the category of failing to provide a "safety device". The misguided emphasis on the magic words "safety device" has already begun to lead to absurd, confusing, and therefore unfair results. As to non-safety device negligence, it appears that ordinary negligence and comparative negligence principles will apply. As to safety device negligence, ordinary negligence evidently applies as to liability, but a special comparative negligence instruction is required under my brother's analysis if the plaintiff "wilfully" removed a safety device.[11]

The confusion perpetuated by that approach in this case is both unsound and unnecessary. By reinventing the comparative negligence wheel

[11] At the time of decedent's death, MCL 408.853; MSA 17.49(3), provided as follows:

"No employee shall wilfully remove, displace, damage, destroy or carry off any safety device or safeguard furnished or provided for use in any employment or place of employment, or interfere in any way with the use thereof by any other person."

The statute was subsequently amended and the word "wilfully" was deleted. MCL 408.1012; MSA 17.50(12):

"An employee shall:

"(a) Comply with rules and standards promulgated, and with orders issued pursuant to this act.

"(b) Not remove, displace, damage, destroy, or carry off a safeguard furnished or provided for use in a place of employment, or interfere in any way with the use thereof by any other person." 1974 PA 154, effective January 1, 1975.

with "wilful removal of a safety device" language, our colleague would create a two-tier tort system, general negligence versus "safety device" negligence, each with its own set of instructions. As discussed above, the application of comparative negligence to *all* workplace negligence satisfies the *Funk* policies as well as encourages safer behavior by both contractors and workers. We prefer a unitary approach to negligence[12] under which both the plaintiff and defendant are charged with the duty to act reasonably under all the circumstances.

## IV

Since the issue is likely to arise upon retrial, we must also consider the appropriate instructions under MCL 408.853; MSA 17.49(3), since repealed. We agree that sufficient evidence was presented to justify an instruction under the statute. We also agree that under *Zeni v Anderson,* 397 Mich 117, 143; 243 NW2d 270 (1976), the trial court should instruct that violation of the statute constitutes a prima facie case of negligence, rather than negligence as a matter of law.

We disagree with the wisdom or necessity of

---

[12] We decline to speculate about the effect of *Placek* and the products liability statute, MCL 600.2945; MSA 27A.2945, on the law of products liability. This case, as well as *Tulkku* and *Funk,* are negligence cases. The cases cited in our brother's opinion for the proposition that comparative negligence should not apply are inapplicable. *Zerby v Warren,* 297 Minn 134, 141; 210 NW2d 58 (1973), held that no comparative negligence defense was available under a statute imposing strict liability for selling model airplane glue to a minor; *Suter v San Angelo Foundry & Machine Co,* 81 NJ 150; 406 A2d 140 (1979), was a strict liability case holding that comparative negligence was unavailable under those facts but noting that comparative negligence *is* a defense in some strict liability cases. See *Ettin v Ava Truck Leasing, Inc,* 53 NJ 463; 251 A2d 278 (1969); *Cintrone v Hertz Truck Leasing & Rental Service,* 45 NJ 434; 212 A2d 769 (1965).

adopting, at this appellate remove, our colleague's definition, or any definition, of the word "wilfully" as used in the since-repealed statute. Neither party requested a definitional instruction in the trial court or objected to the judge's failure to define the term *sua sponte.* We leave it to the trial court to decide in the first instance which of the parties' proposed instructions accurately represents the law on this point.

## V·

As to defendant J & L Roofing Company's cross-appeal that the trial court erred in denying its motions for directed verdict, we agree fully with the result and reasoning of Justice MOODY in part VI of his opinion. The case is therefore remanded for trial on defendant Leonard Construction Company's claim for indemnification.

The decision of the Court of Appeals is reversed.

COLEMAN, C.J., and KAVANAGH and FITZGERALD, JJ., concurred with RYAN, J.

BLAIR MOODY, JR., J. *(dissenting in part).* In granting leave to appeal in this construction-site accident case, the Court directed the parties to include among the questions to be addressed:

What is the status of the contributory negligence defense in safety equipment cases in light of *Funk v General Motors Corp,* 392 Mich 91; 220 NW2d 641 (1974)?

Whether the trial court erred in denying the subcontractor's motion for directed verdict on the general contractor's cross-claim for indemnity. 407 Mich 880 (1979).

We hold that it was error to instruct the jury that the "ordinary" contributory negligence of

plaintiff's decedent would operate as a bar to recovery since the jury could have reasonably concluded that defendants' failure to supply adequate safety devices was the cause in fact of the injury. We further hold that, except under specific circumstances delineated *infra,* the contributory negligence of plaintiff's decedent may not be compared with that of defendants in order to diminish plaintiff's recovery. Finally, we conclude that under the facts of this case the general contractor has failed to establish its right to indemnification from the codefendant subcontractor.

## FACTS

To fully evaluate all the issues presented, it is necessary to review in detail the facts adduced in the record. Kent County contracted with defendant Monsanto Enviro-Chem Systems, Inc. (Monsanto), to construct improvements and additions to a wastewater treatment plant owned by the City of Wyoming.[1] Monsanto delegated the construction work to its subsidiary, Leonard Construction Company (Leonard). As general contractor for this $8,000,000 project, Leonard entered into various subcontracts for completion of the work. Leonard subcontracted the roofing work to J & L Roofing Company (J & L). J & L entered into a contract with J. Klanderman Company (Klanderman), Robert Hardy's employer, to perform the sheet-metal portion of the roofing work.

The accident in question occurred on the roof of the Sludge Thickener Building. The roof of this building, approximately 60' × 90' in size, was constructed of precast concrete beams. There were

---

[1] Complaints filed against the County of Kent and the City of Wyoming were dismissed prior to trial of this matter.

eight openings in the roof, 3' × 6' in dimension.[2]
Three-quarter-inch plywood covers, measuring 4'
× 8', had been initially installed over the roof
openings by Leonard's personnel. The covers were
intended to function as safety devices to prevent
workmen or objects from falling through the roof
openings.

J & L employees commenced work on the roof of
the Sludge Thickener Building two or three days
prior to the accident. The roofing process consisted
of first applying a layer of foam glass insulation
over the concrete beams. Plies of felt were in-
stalled as a base coat on top of the insulation and
were "mopped" over with hot tar. Roofing plies
were then applied over the base coat and the
"mopping" process was repeated.[3]

This process required that the plywood covers,
which overlapped each opening, be removed on at
least two occasions since the roofing materials
were installed flush to the edge of each opening.[4]
Prior to the accident, the cover over the opening
where the accident occurred had been removed at
least once. At the time of the accident, the roofers
had not yet completed work on the opening.[5]

---

[2] Eventually, skylights were to be installed over each of the roof
openings.

[3] Testimony of Ray Boom, J & L president, and Louie Jackson, J &
L foreman.

[4] Mr. Boom testified that his workers would remove a cover to
install the insulation and base coat. The cover was then replaced. The
cover would be removed once more in order to apply roofing plies and
replaced again.

[5] Insulation and a base coat had been installed around the opening
where the accident occurred. However, the final application of roofing
plies had been completed on only one side of the opening. The roofers
had originally planned to finish work on the eastern edge of the
opening during the afternoon of the day Mr. Hardy died.

On the morning of the accident, between 8 a.m. and 9 a.m., the Klanderman crew arrived on the roof of the Sludge Thickener Building to commence the sheet-metal work. The sheet-metal work included placing metal flashing on the perimeter of the roof and eventually installing skylights over the roof openings.

There were three employees in the Klanderman crew, Robert Hardy, plaintiff's decedent, who was also a working foreman, and two other employees, Kenneth Heim and Jay Patmos.[6] The morning of the accident was the first time the Klanderman employees had been on this particular roof.

At that time, five J & L employees were already at work laying roofing plies. The Klanderman crew set their tools on a piece of plywood in the northeast corner of the roof. According to Klanderman employees, this was done to set up operations outside the area where the roofers were working and to keep the tools protected from the roofing tar and cement.

Mr. Heim testified that he worked the entire morning standing on this piece of plywood, drilling metal flashing which was to be installed on the perimeter of the roof. Mr. Hardy and Mr. Patmos spent the morning installing the flashing along the edge of the roof. Heim further stated that he was unaware that the plywood was covering an opening since it did not flex throughout the morning, it was lying at an angle to the edge of the roof, and

---

[6] All three men possessed long-term employment records with Klanderman. Mr. Hardy, Mr. Heim and Mr. Patmos had worked for Klanderman for 28, 19 and 11 years, respectively.

he did not notice any nails in it.[7] Mr. Patmos also
indicated that he was unaware that the plywood
was covering a roof opening. Mr. Heim further
testified that a roof opening nine feet to the west
of his work station was uncovered all morning.

About noon, Klanderman and J & L employees
took a lunch break, and the crews ate their meal
together inside the building. The testimony con-
cerning what occurred during the lunch break
sharply conflicted. Mr. Heim and Mr. Patmos testi-
fied that the J & L foreman, Louie Jackson, asked
Bob Hardy to move the plywood or asked Hardy to
move his tools so that J & L employees could
complete their work in the northeast corner of the
roof that afternoon.

Mr. Jackson denied specifically requesting Mr.
Hardy to move, but added that Hardy "knew" his
crew would have to move out of the area.[8] Other J
& L employees testified that they remembered
hearing no direct request for the Klanderman
crew to move.

After lunch, Mr. Hardy and Mr. Heim proceeded
to the northeast corner of the roof. After placing
their tools on the plywood they had been working
on that morning, they lifted the board to the level
of their knees. Walking backwards, Mr. Heim was
looking behind him. Mr. Hardy cautioned Heim to

---

[7] Pictures taken of the scene after the accident by a Leonard
employee appear to indicate that the cover had been lying at an
angle. However, the plywood depicted in the photographs had nails in
it.

[8] On the morning of the accident, J & L employees were working
toward the northeast section of the roof where the Klanderman crew
had set up its work station.

be careful and to watch out for the uncovered opening nine feet to the west. After taking a few steps, Mr. Heim felt the other end of the plywood slip. Heim then saw the roof opening the crew had been working over all morning. Mr. Hardy had fallen through the opening about 27 feet to the "pit" of the building and died almost instantly.

Every other fact, inference and legal conclusion in this vigorously tried lawsuit was hotly contested. While there was no dispute that Mr. Hardy and his co-worker picked up the cover and moved it, a central point of concern involved whether Mr. Hardy deliberately removed what he knew to be a safety device or whether his action may have constituted either the exercise of due care or inadvertence.

Leonard offered evidence concerning statements allegedly made by Mr. Heim to two Leonard supervisory employees, Donald Cook and Raymond Blake, after the accident.[9] The gist of Heim's statement was that Mr. Hardy and Mr. Heim had "loosened the nails in the board" prior to lunch[10] or had "ripped the plywood up"[11] in order to install skylights. A description of the way the accident occurred followed.

Mr. Heim vigorously denied having made these statements and stated that the Klanderman crew was not ready to install skylights, pointing out that installation of the flashing on the perimeter

---

[9] Plaintiff failed either to object to admission of this evidence or to request that the judge instruct the jury of its limited use for impeachment purposes.

[10] Testimony of Donald Cook.

[11] Testimony of Raymond Blake.

of the roof was not yet finished.[12] Testimony was given concerning normal procedure for installing skylights which involved bringing all skylights to the roof, placing each next to a roof opening, removing the cover of the opening and installing the skylight. Removing all covers before any skylight was installed was considered unsafe practice by Mr. Heim and Mr. Patmos. There was also testimony that skylights could not be installed until the roofers had finished laying roofing plies around the opening.[13] At the time the accident occurred, work remained to be done by the roofers on the opening where the accident occurred.

Finally, there was evidence that the skylights had not arrived on the project until the afternoon of the day Mr. Hardy died. However, as working foreman, Mr. Hardy may have known when the material was scheduled to arrive.

There was testimony offered in favor of the conclusion that Hardy and Heim were preparing to place a curb or metal flashing inside the opening before actually installing the skylights.[14] This was contested by Mr. Heim who stated that the skylights ordered and delivered to the site had built-in curbs.[15]

Other evidence was offered by defendants to

[12] Apparently, a second piece of flashing had yet to be installed around the entire edge of the roof at the time of the accident, according to testimony of Jay Patmos. However, Mr. Patmos admitted that it was possible to install skylights and later finish installing the flashing on the roof's edge.

[13] Testimony of Kenneth Heim, Jay Patmos and Ernest Louie Jackson, J & L's foreman.

[14] See testimony of Donald Cook and Raymond Blake.

[15] See rebuttal testimony of Kenneth Heim and testimony of Ray Boom, J & L's president.

indicate a lack of care on the part of Mr. Hardy in failing to discern that the plywood was a roof opening cover and constituted a safety device rather than simply a sheet of plywood lying on the roof. As working foreman, he had the opportunity to check the roof plans.[16] Defendants posited that during his morning's work of installing flashing on the edge of the roof Mr. Hardy should have seen the pattern of plywood covers on the roof.[17] Defendants' testimony suggested that if Mr. Hardy saw nails in the plywood he should have realized that it was or at one time had been used as a covering for a roof opening. Finally, defendants contend that Mr. Hardy should have noticed whether or not there were extra pieces of plywood on the roof.

Concerning selection of the safety devices and adequacy of the devices, the following was adduced. Before work on the roof began, Leonard installed the 4' × 8' plywood covers over the 3' × 6' roof openings to function as safety devices.[18] The covers were secured by nails driven into two-by-four pieces of wood built inside the openings.

Plaintiff's expert testified concerning available safety devices he considered preferable to the devices utilized. Alternative safety equipment discussed included safety nets, belts, guardrails around the openings or a combination of a guardrail and a hinged plywood cover. Plaintiff's expert further testified regarding the need for warning signs and employee safety instruction.

---

[16] Plaintiff countered by pointing out that the roof plans were 93 pages long and that the page showing the details for the roof edge did not indicate location of the roof openings.

[17] The roof, however, was 60' × 90' in dimension.

[18] There was some conflict regarding when the covers were first installed and whether they were installed pursuant to a request by J & L, according to testimony of Bernard Kondracki, a J & L employee.

There was also testimony offered by plaintiff concerning whether plywood covers installed in a different manner would have better put a worker on notice that the plywood was covering a roof opening. For example, a curb of wood could have been built up around the roof opening with the plywood secured on top of the curb. Thus elevated, the plywood would have more obviously been perceived as a safety device. The original plans called for curbs to be built around the roof openings. There was testimony that indicated the plans were changed and that the skylights ordered and delivered for installation on the project contained built-in curbs. Thus, no curbs were built on the roof.[19]

Defendant Leonard's expert testified that some of the alternate safety devices proposed by plaintiff's expert contained features which rendered them unsafe or unsuitable for use in the instant situation. Defendant's expert, along with employee-witnesses, further testified that in his experience it was customary to use plywood covers to alleviate the danger posed by openings on a flat roof.

All witnesses appeared to agree that a plywood cover *could* constitute an adequate safety device but only if it was properly secured against accidental displacement. The method of securing these covers and the system for insuring that the covers remained secured thus became a focal point of dispute.

[19] It was unclear who was responsible for ordering materials or changing the plans. The J & L president, Ray Boom, testified that J & L was not responsible. He surmised that Leonard changed the plans or that Klanderman, Mr. Hardy's employer, may have requested the change. If Klanderman requested the change it would have had to be approved by Leonard. Jay Patmos believed that J & L requested the change. Jack Young, Leonard's construction superintendent, was not sure who requested the change.

Photographs taken of the roof opening after the accident by Mr. Donald Cook, Leonard's office manager and safety inspector, were admitted into evidence. There was a great deal of conflict in the testimony of Leonard's employees concerning the type of nails which were used to secure the plywood cover shown in the pictures. The nails in the plywood cover portrayed in the pictures were variously described as "finishing nails with a smaller head",[20] "not finishing nails",[21] "eight or ten penny nails",[22] or "common nails with big flat heads".[23] There was also a conflict concerning whether the heads[24] or the points[25] of the nails were shown in the picture.[26]

There was much testimony indicating a conflict among defendants' employees regarding the type of nails which were used or should have been used to adequately secure the covers.[27] Leonard's own expert testified that an acceptable manner of securing such covers involved using "eight common or eight double head nails". He considered use of finishing nails as an unacceptable method.[28]

Whether or not the plywood sheet depicted in

[20] Testimony of Donald Cook.

[21] Testimony of Rolling Simonds, Leonard's expert witness.

[22] Testimony of Raymond Blake, Leonard's field engineer and safety inspector.

[23] Testimony of Jack Young, Leonard's construction superintendent.

[24] Testimony of Donald Cook.

[25] Testimony of Raymond Blake.

[26] The pictures portrayed six or seven nails in the board. Testimony of Donald Cook.

[27] For example, Jack Young, Leonard's construction superintendent stated one should use "common nails with large flat heads to secure these covers". Leonard's carpenters testified that they used "three- or three-and-one-half-inch nails" to secure the boards. J & L's foreman stated that his crew would sometimes use "long shingle nails" to resecure the covers.

[28] Testimony of Thomas Healy.

the photographs was the one covering the opening
through which Mr. Hardy fell was hotly disputed.
Mr. Heim and Mr. Patmos testified that the ply-
wood in the picture was too clean and contained
nails, whereas the plywood covering the opening
where the accident occurred had no nails and
would have been dirty as a result of the Klander-
man crew's use of it as a work station all morning.

Certain testimony related to the manner in
which the plywood covers could be removed. Mr.
Jackson, J & L's foreman, explained that it was
sometimes possible to "rip the plywood up" or lift
the covers up without using any tools to pry the
nails loose.[29] Mr. Cook, Leonard's office manager
and safety inspector, opined that a worker would
probably use a claw hammer to loosen the nails.
Leonard's expert conceded that if the cover were
properly secured, it would be impossible to simply
"rip the plywood up".

A great deal of evidence dealt with the methods
and practices of both defendants in resecuring the
covers after the plywood had been removed to
complete steps in the roofing process. There was

---

[29] "*Q.* And how would you do that? How would you get those covers
off of there?

"*A.* Sometimes you would pull the, just grab ahold and just pull
them right up. See, they were nailed into a two-by-four sideways. The
two-by-four wasn't flat, the two-by-four was on edge, and you can nail
right into that and it don't hold solid that way. Anyone can just grab
ahold of that piece of plywood and pull it right up.

"*Q.* Rip it right up?

"*A.* Yes.

* * *

"*Q.* Did you have to remove the nails to lift them up every time you
put an application on?

"*A.* We just pulled them up. We just pulled the plywood up. The
nails were bent. We couldn't really use them. We put all our plies and
moppings down around the hole and we would lay our plywood right
back and cover the hole back up with plywood."

testimony to the effect that the covers were initially installed by Leonard's employees and secured with large nails before work commenced on the roof.[30] Leonard's supervisory personnel were aware that people would be working on the roof and that it would be necessary to remove the covers during the roofing process.[31]

As a result, Leonard's personnel testified that the covers were regularly checked by Leonard carpenters. Mr. Kolehouse, Leonard's carpentry foreman, stated that he checked the covers every morning at approximately 8 a.m. Mr. Nieland, a Leonard carpenter, stated that he checked the covers every afternoon at 3:30 or 4:00 p.m.[32] There was testimony that, if covers were found to be inadequately secured, the carpenters would renail them.

J & L's methods of resecuring the covers varied. While the J & L foreman ordered his crew to renail the covers, he did not check the covers to see whether his orders were carried out. If the roofing employees had nails at their disposal, they would drive shingle nails into the plywood. On other occasions, the covers were replaced and left for Leonard carpenters to resecure.[33]

While these efforts were taken to resecure the plywood covers, confusion existed concerning

[30] Testimony of Ernest Kolehouse, Leonard's carpentry foreman.

[31] Testimony of Jack Young; testimony of Donald Cook.

[32] Mr. Kolehouse also stated that he would check the covers on and off throughout the day. Covers were also checked daily by Raymond Blake, Leonard's field engineer, according to testimony of Donald Cook.

[33] Testimony of Louie Jackson, J & L foreman, Bernard Kondracki, former J & L employee, and Donald Cook, Leonard's office manager and safety inspector.

whose responsibility it was to see that the covers were properly secured while people were actually working on the roof. Leonard's expert, among others, testified that it was customary to expect that the person removing a safety device should replace it. Further, it was Leonard's position that the step of initially installing the covers was a sufficient effort on behalf of worker protection[34] or that installation of the covers and the daily inspections by Leonard's carpenters were sufficient efforts.[35] Finally, Leonard believed that since J & L had assumed safety duties in its contract with Leonard, J & L had the sole responsibility to see that the covers were resecured.[36]

However, there was some question concerning whether or not J & L roofers were led to rely on the efforts of Leonard's carpenters in insuring that the covers were properly resecured.[37] Whether or not J & L's reliance on the carpenters' efforts was reasonable, testimony also indicated that Leonard took no steps to instruct or inform J & L employees concerning procedures to follow after covers were removed.[38]

Leonard's expert, Thomas Healy, admitted that he would not assume that the roofers were aware

[34] Testimony of Jack Young, Leonard's construction superintendent.

[35] Testimony of Donald Cook, Leonard's office manager and safety inspector.

[36] Testimony of Jack Young and Donald Cook.

[37] It was intimated that roofers renailing covers may have resulted in jurisdictional disputes. The carpenters could have viewed such action as crossing into their trade. See testimony of Jack Young and Donald Cook.

Further, there was evidence that Leonard's carpenters represented to J & L employees that the carpenters would renail the covers at the end of the day. See testimony of Louie Jackson, J & L's foreman.

[38] Testimony of Jack Young and Donald Cook.

that they should resecure the covers stating, "The guy that might fall through there might be me."

Depending on whom the jury believed, there was evidence that roof openings were uncovered or that plywood covers were inadequately secured before and after the accident. Leonard employees testified that they checked the covers on the morning of the accident and found the covers secured. Mr. Heim testified that during the morning a roof opening nine feet to the west of the opening where the accident occurred was definitely uncovered. He further stated that while he noticed that other roof openings were uncovered he was unable to estimate the number of such openings since he worked in one location all morning.

Mr. Patmos noticed uncovered roof openings in the course of his work installing flashing on the edge of the roof. He estimated that approximately three openings were uncovered.

Louie Jackson, J & L's foreman, testified that his crew was working toward the northeast corner of the roof where the Klanderman crew was located. He stated that, while his crew uncovered roof openings or loosened covers, they did not loosen all roof coverings. He admitted, however, that there were two inexperienced J & L employees on the job at this site.

There was a decided conflict in the testimony concerning whether all roof openings were covered and whether the covers were secured after the accident. After the accident, Mr. Cook, a Leonard employee, and Jay Patmos, Mr. Hardy's co-worker, were in the pit of the building attempting to administer first aid to Mr. Hardy. Mr. Cook testi-

fied that it was dark in the pit and that the only roof opening which was uncovered was the opening Mr. Hardy fell through. This was disputed by Mr. Patmos who stated that he could see through two roof openings, the one through which Mr. Hardy fell and the opening nine feet to the west of it.

Two of Leonard's supervisory employees, Donald Cook and Jack Young, testified that they checked all or some of the roof openings after the accident and found the covers in place and secured. This testimony conflicted with that of Allen Luurtsema, a police officer on the roof investigating the accident. Officer Luurtsema indicated that he was able to lift up the cover over the opening nine feet to the west of the accident opening and remembered seeing no nails or nail holes in that cover. Mr. Cook and Mr. Young stated that the cover to the west of the accident opening was nailed down.

At the end of trial, plaintiff made a motion to exclude reference to the defense of contributory negligence in final argument and the jury charge. Defendant J & L also moved for a directed verdict on Leonard's cross-claim for indemnity. Both motions were denied.

The jury rendered a verdict in favor of all defendants. A polling of the jury indicated that five of the six jurors concluded that while defendants were negligent, plaintiff's decedent had also been negligent.

The Court of Appeals affirmed, with Judge T. M. Burns dissenting. This Court granted leave to appeal. 407 Mich 880.

DISCUSSION

I

In *Funk v General Motors Corp,* 392 Mich 91; 220 NW2d 641 (1974), this Court recognized that a general contractor has a common-law duty to take reasonable steps within his supervisory authority to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen. Such reasonable steps by a general contractor include either providing safety equipment or implementing safety programs or requiring subcontractors to provide such equipment or implement such programs.

The *Funk* Court concluded that, from a practical viewpoint, the general contractor was in the best position to coordinate work and bear the expense of safety equipment and programs. Thus, placing ultimate responsibility for job safety in common work areas on the general contractor was an attempt to foster job safety and accident prevention.

In the more recent case of *Tulkku v Mackworth Rees Division of Avis Industries, Inc,* 406 Mich 615; 281 NW2d 291 (1979), our Court concluded that no valid distinction existed between the failure to supply any safety device and the failure to provide an adequate safety device. Therefore, under the *Funk* and *Tulkku* decisions, where applicable, a general contractor's duty includes the responsibility to provide or require subcontractors to provide adequate safety equipment or safety programs.

Defendant Leonard[39] claims first that as general contractor it had no duty to Mr. Hardy under the *Funk* and *Tulkku* decisions and second, assuming it had such a duty, Leonard faithfully discharged its responsibility.

Leonard raises four issues in support of its argument that *Funk* should not be applied to the instant case:

1. Whether there was a conspicuous failure on the part of Mr. Hardy's employer to provide safety equipment;

2. Whether there existed an obvious and avoidable danger to protect against;

3. Whether the hazard existed in a common work area; and

4. Whether the hazard presented a high degree of risk to a significant number of workmen.

Leonard argues that, unlike the *Funk* case, here there was no obvious failure on the part of Mr. Hardy's employer to provide safety devices. There was testimony that Klanderman failed to provide its employees with any safety training or safety devices. It is urged that this failure on the part of Mr. Hardy's employer was not obvious to the general contractor.

In *Funk,* this Court placed "ultimate responsibility on the general contractor for job safety in common work areas". Our Court held that a gen-

---

[39] Two corporate entities were joined as the general contractor in this case, Leonard and Monsanto. Since Leonard actually conducted all the field construction work on behalf of Monsanto, Leonard will be referred to as the general contractor.

eral contractor had a duty to take reasonable steps to "guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen". 392 Mich 104. The fact that there may have been no conspicuous failure by the immediate employer to provide safety equipment does not relieve a general contractor from a *Funk* duty to provide safety devices. Such an assertion is only a factor to be considered in determining whether Leonard reasonably complied with its duty under *Funk* to provide adequate safety equipment within its supervisory and coordinating authority.

Furthermore, even assuming that Klanderman's failure to provide safety devices may not have been obvious, this was affected at least in part by Leonard's own actions in selecting the plywood covers as safety devices. It could be considered unreasonable to expect a sheet-metal subcontractor on a project of this size, after a general contractor has provided items intended to function as safety devices, to select different protective equipment for its employees, especially where the subcontractor had no notice that the safety devices supplied were inadequate.

Leonard next argues that there was no obvious and avoidable danger to protect against, since, among other things, nailed-down plywood covers constituted adequate safety devices which alleviated any danger. We cannot agree.

The obvious and avoidable danger was created by the presence of large roof openings 27 feet above the ground through which workers could fall resulting in serious injury or death. Whether Leonard took reasonable steps in guarding against

such danger and whether the safety devices selected by Leonard were adequate are questions to be resolved by a jury and not this Court.

Finally, Leonard argues that no *Funk* duty arose since the danger did not exist in a common work area, nor did it pose a high degree of risk to a significant number of workmen. In its contract with Leonard, J & L agreed to seek Leonard's written approval before J & L subcontracted any of the roofing work. Leonard argues that since J & L did not obtain Leonard's approval before contracting with Klanderman to perform the sheet-metal work on the roof, and since J & L agreed to indemnify Leonard for losses caused by J & L's subcontractors, the roof did not constitute a common work area.

This reasoning ignores the fact that Leonard was fully aware of the involvement of the Klanderman sheet-metal subcontractor before any work on the roof commenced. Ray Boom, J & L's president, testified that Klanderman had to submit plans for the sheet-metal work to Leonard and that Leonard, as general contractor, had to approve such plans. Further, there was testimony by Leonard's supervisory personnel that they were aware that the sheet-metal workers were doing work on this particular roof.

On the day the accident occurred, there were at least seven employees of two subcontractors on the roof. We conclude that the danger created by the roof openings existed in a common work area and posed a high degree of risk to a significant number of workmen.[40]

---

[40] Leonard questions the validity of the rationale employed in *Erickson v Pure Oil Corp*, 72 Mich App 330; 249 NW2d 411 (1976),

Second, Leonard posits that, assuming it had a duty under *Funk,* it discharged that duty as a matter of law. It asserts that the plywood covers were clearly adequate safety devices. Further, Leonard contends that installation of the nailed-down covers and the daily inspections by Leonard employees left no doubt that Leonard took reasonable steps to insure worker safety.

Sufficient evidence was presented in support of various theories to raise a question of fact concerning the adequacy of the plywood covers as safety devices and the reasonableness of Leonard's actions. For example, alternate safety devices could have been utilized. Thus, the jury could have concluded that the devices selected were inadequate. Further, the safety devices selected were deemed adequate only when secured and if properly secured. Leonard knew that people would be working on the roof and that the covers would have to be removed to complete the roofing work. While Leonard employees made inspections, generally in the early morning and late afternoon, the jury could have concluded that Leonard was negligent in not taking certain steps to insure that the covers were resecured while men were actually working on the roof.

Furthermore, there was evidence indicating that Leonard did not instruct J & L employees concerning the procedure to follow in replacing covers. Leonard held no safety meetings with the subcontractors, and Leonard did not supply J & L roofers

---

where the Court of Appeals concluded that a common work area is one where two or more subcontractors will *eventually* work. We need not address the validity of the *Erickson* Court's conclusion, since, in the instant case, it is undisputed that employees of at least two subcontractors were actually present and working together on the roof at the same time. The roof was a common work area.

with large nails to be used in resecuring the covers. In addition, it is not clear that Leonard employees inspected the covers on a regular basis during the working day when unsecured covers would pose the highest risk of danger to workmen.

Indeed, the testimony at trial revealed that a good deal of confusion existed concerning whose responsibility it was, between Leonard and J & L, to resecure covers during the working day. If the jury concluded that the covers were adequate safety devices only when secured, the jury could have further concluded that Leonard failed to take reasonable steps toward either maintaining the covers as adequate safety devices itself or requiring the subcontractor to do so.

The jury could have also found that had the general contractor properly coordinated efforts to resecure these covers, the accident would not have occurred. J & L's roofing employees would have had reason to know which covers had been removed and not yet resecured since these employees actually removed the covers during their work. Employees of other subcontractors, such as Mr. Hardy, would not necessarily realize that these covers were safety devices, nor know which covers were unsecured.

Finally, the jury could have reasonably believed that the covers were adequate safety devices only if properly secured with certain types of nails to prevent accidental displacement or removal. Testimony of Leonard and J & L employees concerning the type of nails used to secure covers and the type of nails depicted in the photographs of the accident scene differed markedly. There was sufficient evidence to support a conclusion that some

or all of the covers on the roof were inadequately secured.

For the foregoing reasons, we conclude that Leonard, as general contractor, had a duty to take reasonable steps to alleviate the danger posed to workmen by the roof openings. We cannot say, as a matter of law, that Leonard discharged its duty. Whether Leonard acted reasonably by itself providing adequate safety devices and programs or by requiring its subcontractor, J & L, to do so are questions for the jury.

## II

Defendant, J & L, argues that, as subcontractor, it had no duty under *Funk,* or, assuming that J & L did have such responsibility, it is clear that J & L did not breach its duty. J & L argues, in essence, that since Leonard took the initiative to install covers as safety devices and undertook to inspect the covers, J & L had no responsibility to itself implement a safety program or require Klanderman or Leonard to initiate a safety program.

We need not decide whether J & L had a common-law duty to provide adequate safety devices to prevent injury to the employees of other subcontractors under our *Funk* decision.[41] In the instant

---

[41] None of the parties have briefed the issue of whether a subcontractor is or may be subject to the common-law duty of a general contractor recognized in *Funk.* J & L has simply asserted that by virtue of its status as subcontractor, *Funk* does not apply.

It is to be noted that in *Funk, supra,* 104, fn 6, we stated that the analysis applied to a general contractor is not necessarily applicable where an injured employee of one subcontractor seeks to impose liability upon another subcontractor.

This is not to say, however, that in cases where a subcontractor is functioning in the capacity of a general contractor and is, for example, exercising control over another subcontractor's work or over a common work area, the common-law duty recognized in *Funk* would

case, J & L clearly assumed such a duty in its contract with Leonard. It had the responsibility to perform its contractual objectives with ordinary care. J & L agreed to:

"[T]ake all necessary precautions for the safety of all persons engaged on the work and [to] comply with all applicable provisions of federal, state and municipal safety laws and building codes to prevent accidents or injuries to persons on, about, or adjacent to the premises where the work is being performed, *including the erection, where appropriate, of all necessary safeguards.*" (Emphasis added.)

Many courts adopting *Funk* or *Funk*-like approaches have recognized the right to recovery of employees injured in construction site accidents caused by inadequate safety equipment or programs against general contractors[42] or subcontractors[43] based on the theory of negligent performance of contractually assumed safety duties. Many of these courts have held that a general contractor may not delegate its duties regarding safety devices and programs to a subcontractor by having the subcontractor also contractually assume safety duties.[44]

---

not apply. See, *e.g., Federal Cement Tile Co v Henning,* 32 F2d 163 (CA 8, 1929).

While J & L subcontracted the sheet-metal work to Mr. Hardy's employer and there was testimony, which, if accepted by the jury, would indicate that J & L directed Mr. Hardy and his co-employees to change their work station, plaintiff has not specifically advanced the theory in her brief that J & L was thereby functioning as a general contractor. In any event, we need not resolve the question.

[42] See *Horn v C L Osborn Contracting Co,* 591 F2d 318 (CA 5, 1979); *Smith v United States,* 497 F2d 500 (CA 5, 1974); *Giarratano v Weitz Co,* 259 Iowa 1292; 147 NW2d 824 (1967); *Maness v Fowler-Jones Construction Co,* 10 NC App 592; 179 SE2d 816 (1971); and *Kelley v Howard S Wright Construction Co,* 90 Wash 2d 323; 582 P2d 500 (1978).

[43] See, *e.g., Rabar v E I DuPont de Nemours & Co, Inc,* 415 A2d 499 (Del Super Ct, 1980).

[44] *Kelley, supra,* 90 Wash 2d 333; *Smith, supra,* 497 F2d 512;

However, we see no reason why J & L may not also be held to answer for its own failure to perform its contractual obligations with care. In *Funk,* this Court recognized that job safety on a construction site is not necessarily the sole responsibility of any single entity. Nor should it be.[45] We further recognized that the nature of the risk involved has some bearing on who should bear responsibility for taking appropriate safety precautions. 392 Mich 109. It is not unfair to hold J & L to its contractually assumed *Funk* duties especially where, as here, the subcontractor shared almost exclusive control with the general contractor over the safety devices alleged to be inadequate.

Finally, we cannot agree with J & L's assertion that J & L did not breach a *Funk* duty as a matter of law. We cannot say that J & L had an unqualified right to rely on the efforts of Leonard in discharging J & L's own duties of care in maintaining adequate safety devices in the common work area of the roof. There was sufficient evidence from which the jury could conclude that J & L breached its duty to Mr. Hardy by failing to itself implement a program to properly resecure covers removed during the roofing process.[46]

*Giarratano, supra,* 259 Iowa 1304-1305.

[45] Figures compiled by the United States Department of Labor indicate that on an average, 10% of employees covered by OSHA are injured or become ill during an annual period. By comparison, the rate for occupational injury or illness of employees in the construction trades is 20%. See discussion in *Brennan v Occupational Safety & Health Review Comm,* 513 F2d 1032, 1038-1039 (CA 2, 1975).

Courts have adhered to the rationale that imposing safety duties arising from common-law, statute or contract on various participants in the construction industry other than the immediate employer of an injured workman will enhance or encourage safer practices. See, *e.g., Alber v Owens,* 66 Cal 2d 790, 795; 59 Cal Rptr 117; 427 P2d 781, 785 (1967), and *Rabar v E I DuPont de Nemours & Co, Inc,* 415 A2d 499, 504, 505 (Del Super Ct, 1980).

[46] The jury could have also reasonably concluded that J & L

## III

Plaintiff made numerous motions to exclude reference to the contributory negligence of plaintiff's decedent as a valid defense to claims that defendants breached duties under *Funk.* The trial judge denied these motions, having concluded that this case did not fall within *Funk.* Defendants were permitted to argue contributory negligence to the jury. The jury was similarly instructed that the ordinary negligence of Mr. Hardy would operate as a complete bar to recovery. The Court of Appeals affirmed on this point, narrowly construing our decision in *Funk,* reasoning that since at one time a safety device was supplied *Funk* did not apply, and that Mr. Hardy's negligence constituted a valid defense.

In *Funk,* this Court held that contributory negligence is no defense where a jury may reasonably conclude that the failure to provide necessary safety equipment was the cause in fact of the injury. Subsequently, in *Tulkku,* our Court reaffirmed this holding and concluded that contributory negligence is an invalid defense where the failure to provide adequate safety equipment is causally connected to plaintiff's injury.

Since there was sufficient evidence presented of defendants' causal negligence in providing necessary and adequate safety equipment, we hold that it was error to instruct the jury and to permit argument concerning the ordinary contributory negligence of plaintiff's decedent and that reversal is required.

## IV

We must next consider whether the doctrine of

---

breached a common-law duty of care by negligently failing to resecure covers or inadequately resecuring covers that had been removed.

comparative negligence should be applied to re-
duce an injured worker's recovery where the jury
may reasonably conclude that the plaintiff's injury
was caused by breach of the duties delineated in
*Funk.* We would hold that except where there is
evidence that the worker unreasonably altered,
dismantled, or failed to use an otherwise adequate
safety device, the jury may not be instructed on
comparative negligence where plaintiff has made a
jury-submissible issue as to whether the defendant
violated a *Funk* duty to provide an adequate safety
device.[47]

In *Placek v Sterling Heights,* 405 Mich 638; 275
NW2d 511 (1979), our Court replaced contributory
negligence as a complete defense and judicially
adopted the doctrine of comparative negligence in
its "pure" form. Under the new doctrine, the
percentage of a plaintiff's negligence or fault
which contributed to his or her injury would be
assessed by the jury and would operate to reduce
rather than bar the plaintiff's recovery. We di-
rected that a special verdict be used in cases
where the negligence of the plaintiff is "at issue".
*Id.,* 662.

In *Funk,* our Court held as a matter of policy
that a worker's contributory negligence would not
operate as a defense where the jury could conclude

---

[47] A number of Court of Appeals panels have concluded that com-
parative negligence should not apply to claims alleging breach of a
duty to provide necessary and adequate safety devices. *Brown v Unit
Products Corp,* 105 Mich App 141; 306 NW2d 425 (1981); *Tulkku v
Mackworth Rees Division of Avis Industries, Inc (On Remand),* 101
Mich App 709; 301 NW2d 46 (1980), *lv den* 411 Mich 897 (1981);
*Stambaugh v Chrysler Corp,* 96 Mich App 166; 292 NW2d 510 (1980),
*lv den* 409 Mich 911 (1980), and *Timmerman v Universal Corrugated
Box Machinery Corp,* 93 Mich App 680; 287 NW2d 316 (1979). Other
panels, distinguishing the *Funk* and *Tulkku* decisions, have held it
proper to apply comparative negligence as a defense. *Wells v Coulter
Sales, Inc,* 105 Mich App 107; 306 NW2d 411 (1981) and *Rivers v Ford
Motor Co,* 90 Mich App 94; 280 NW2d 875 (1979).

that the injury was caused by the failure to provide safety devices. In *Tulkku,* contributory negligence was held to be an invalid defense where evidence was adduced concerning a defendant's causal negligence in supplying inadequate safety devices.

We would decline to apply comparative negligence to cases involving breach of *Funk* duties for two reasons. First, the negligence of a plaintiff in a *Funk* case was not "at issue" prior to our adoption of comparative negligence. Second, we conclude that the rationale underlying our action in barring the defense in the *Funk* and *Tulkku* decisions remains viable today.

Where the defendant is obligated to provide an adequate safety device to guard against a worker's negligence and fails to do so, the negligence of a worker which should not have resulted in injury if the defendant had done so was declared legally irrelevant in *Funk* and *Tulkku.* No compelling reasons have been advanced in favor of resurrecting a defense which was discredited and formerly barred. Adoption of the comparative negligence doctrine in *Placek* did not create liability where none existed before.[48]

The reasons for barring the defense of contributory negligence in these types of cases remain viable today. In *Funk,* our Court considered a well-developed principle that in cases involving breach of certain statutory standards of care a plaintiff's contributory negligence constituted no defense. In particular classes of safety statutes, courts have

[48] Other courts have similarly refused to apply comparative negligence principles to cases in which contributory negligence had been declared an invalid defense prior to adoption of comparative negligence. *Zerby v Warren,* 297 Minn 134, 141; 210 NW2d 58, 63 (1973). See also *Brown v Unit Products Corp,* 105 Mich App 141, 154; 306 NW2d 425 (1981), and *Stambaugh v Chrysler Corp,* 96 Mich App 166, 173, fn 3; 292 NW2d 510 (1980).

recognized a legislative intent that the persons to be protected by a defendant's compliance with the statute were peculiarly unable to protect themselves from the risk posed by the statutory violation. Thus, allowing a plaintiff's negligence to excuse a defendant's noncompliance with certain statutory standards would subvert the legislative intent.[49]

One of these categories involved statutes prescribing the provision of safety equipment in the workplace for the purpose of accident prevention. *Koenig v Patrick Construction Corp,* 298 NY 313; 83 NE2d 133 (1948); *Osborne v Salvation Army,* 107 F2d 929 (CA 2, 1939). Our Court in *Funk* simply applied this principle to cases involving breach of a common-law duty to provide safety equipment.

The rationale behind our action in *Funk* was aptly stated by the New Jersey Supreme Court and quoted with approval in our *Tulkku* decision as follows:

" 'It would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against. We hold that under the facts presented to us in this case the defense of contributory negligence is unavailable. *Bexiga v Havir Manufacturing Corp,* 60 NJ 402, 412; 290 A2d 281 (1972).' " *Tulkku, supra,* 406 Mich 622.

Recently, the New Jersey court reaffirmed the

---

[49] For a general discussion of the types of statutes which courts have construed as barring the use of contributory negligence as a defense in actions based upon breach of the statutory standard of care, see Prosser, Torts (4th ed), § 36, pp 197-198. See also *Osborne v Salvation Army,* 107 F2d 929 (CA 2, 1939); *Tamiami Gun Shop v Klein,* 116 So 2d 421 (Fla, 1959); *Zerby v Warren,* 297 Minn 134; 210 NW2d 58 (1973), and *Koenig v Patrick Construction Corp,* 298 NY 313; 83 NE2d 133 (1948).

rule announced in *Bexiga*,[50] that the contributory negligence of a worker constitutes an invalid defense in actions based on breach of a duty to provide adequate safety devices, notwithstanding the enactment of a comparative negligence statute in that state. *Suter v San Angelo Foundry & Machine Co,* 81 NJ 150, 167-168; 406 A2d 140, 148-149 (1979).

We continue to agree that allowing a worker's negligence to operate as a total or partial defense and thus relieve a defendant of its duty would be anomalous in instances where the presence of an adequate safety device would have prevented the injury.

Our goal in *Placek* was to achieve a more equitable balance between causal negligence and loss allocation. The thrust of our action in *Funk* was to encourage implementation of reasonable workplace safeguards as well as to insure just compensation for injured workers. Applying comparative negligence to cases involving breach of a defendant's obligation to provide a safety device adequate to avert injury to a worker whose negligence should have been averted by such a device would substantially undercut a primary goal of fostering worker safety by encouraging the provision of necessary safety devices for a number of reasons.

The relative abilities of a worker and a contractor to avoid or eliminate the risk of injury posed by absent or inadequate safety devices widely differ. Financially, contractors are in a far superior position than workers to bear the expense of providing safety devices and are able to pass this cost on in their bid price. Contractors have supe-

[50] The *Bexiga* rationale was also relied upon in *Coty v U S Slicing Machine Co, Inc,* 58 Ill App 3d 237; 15 Ill Dec 687; 373 NE2d 1371 (1978).

rior access to information concerning whether a safety device is necessary and what type of safety device would be considered reasonably adequate.

It would be unrealistic to conclude that workers have a choice not to work where dangerous conditions exist, especially considering the current state of our economy. Employees may often become conditioned to working in places of potentially great peril.

In many instances, workers are injured because they are relying on what appears to be an adequate safety device. *Tulkku, supra,* 622. Further, ordinary inadvertence of workers, often caused by attention to the details of their work, the monotony of the task, or job pressures, may result in accidents which could have been prevented had an adequate safety device been supplied.[51]

Finally, in most instances, a worker's conduct, which may or may not constitute negligence, will occur much closer in time to his or her injury than the defendant's alleged negligence in failing to supply proper safety devices which would have prevented the injury. In allowing a jury to assess the relative culpability of both parties, it may be difficult for many jurors not to conclude that the worker's actions were disproportionately the more significant contributing cause of his injury since they occurred closer in time to the event. Thus, the worker's recovery would often be diminished to an excessive extent or be extinguished. Such a result not only undercuts the rules set forth in

[51] Other courts have recognized that persons employed in places of possible danger may as a natural consequence exercise a lesser standard of care for their own safety since they must pay attention to the details of their work or because the employees become conditioned to the presence of unsafe conditions. See, *e.g., Pike v Frank G Hough Co,* 2 Cal 3d 465, 473; 85 Cal Rptr 629; 467 P2d 229, 234-235 (1970), and *Shannon v Howard S Wright Construction Co,* 181 Mont 269, 273; 593 P2d 438 (1979).

*Funk* and *Tulkku,* but also clashes with the rationale underlying those decisions.

Considering the disparate abilities of the parties to avoid the risk of harm posed by absent or inadequate safety devices and the reasons expressed above, we conclude that the negligence of a plaintiff in cases involving breach of *Funk* duties should not be considered as a total or partial bar to recovery except where there is evidence that the worker unreasonably altered, dismantled or failed to use an otherwise adequate safety device.

### V

We must next decide whether it was proper to instruct the jury concerning Mr. Hardy's alleged violation of a statutory standard of care, thus injecting the issue of plaintiff's contributory negligence into the case. We conclude that while it was proper to instruct the jury concerning this statute, the jury was improperly charged concerning the standard of care set forth in the statute.

Over plaintiff's objection, the jury was instructed concerning Mr. Hardy's breach of the following statute which provided in pertinent part:

"No employee shall wilfully remove, displace, damage, destroy or carry off any safety device or safeguard furnished or provided for use in any employment or place of employment, or interfere in any way with the use thereof by any other person." 1967 PA 282; MCL 408.853; MSA 17.49(3).

With the exception of the word "willful", this provision was included in substantially similar form in the act which originally set forth broad occupational safety standards in Michigan and created an occupational safety standards commis-

sion.[52] The expressed purpose of the act was to prevent accidents in the workplace by implementing safety education and training programs. MCL 408.861; MSA 17.49(11).

While § 3 of the act declares that certain conduct on the part of employees is prohibited, no penalties are provided in the act for noncompliance by employees. All penalty provisions are aimed at penalizing noncompliance by employers. See, for example, MCL 408.860; MSA 17.49(10) and MCL 408.867; MSA 17.49(17).

Absent explicit legislative language creating civil liability, common-law courts retain ultimate discretion in deciding whether or not to apply a statutory standard of care in a civil action in lieu of common-law standards. *Zeni v Anderson,* 397 Mich 117, 137; 243 NW2d 270 (1976). In aid of exercising that discretion, courts often look to the statute to ascertain whether application of the statutory standard of care would further legislative intent.

The statute in question is an obvious attempt to encourage employees to utilize safety devices provided to them and in turn foster accident prevention in the workplace. This goal is also compatible with the rationale supporting our *Funk* and *Tulkku* decisions. The goal of encouraging contractors to provide reasonably adequate safety devices where needed is thwarted where employees know-

---

[52] The act, including MCL 408.853; MSA 17.49(3), was repealed and replaced by the Michigan Occupational Safety and Health Act. MCL 408.1001 *et seq.;* MSA 17.50(1) *et seq.* Currently, MCL 408.1012; MSA 17.50(12), defines an employee's duties under the act:

"An employee shall:

"(a) Comply with rules and standards promulgated, and with orders issued pursuant to this act.

"(b) Not remove, displace, damage, destroy, or carry off a safeguard furnished or provided for use in a place of employment, or interfere in any way with the use thereof by any other person."

ingly refuse without a reasonable excuse to accept the protection afforded by such devices, or where the employees unreasonably alter or dismantle such devices, or unreasonably interfere with their co-workers' use of such devices.

More importantly, the statute in question is not geared toward inadvertent employee conduct. Section 3 prohibits the willful removal or alteration of a safety device.

In *Funk, supra,* 392 Mich 113, fn 18, we reserved judgment on the issue whether employee conduct which qualitatively goes beyond the lack of due care or inadvertence may constitute a proper defense. We conclude that a worker's breach of this statutory standard of care, properly construed, may constitute a defense to claims alleging breach of duties delineated in our *Funk* and *Tulkku* decisions.

While there was sufficient evidence adduced in this case to justify giving an instruction concerning this statute,[53] the jury was improperly instructed concerning the statute's standard of care.

The statute proscribes willful conduct by employees. The meaning of the word willful may vary according to the context in which it is used. As noted by the Court in *Highway Comm'rs of Eagle Twp v Ely,* 54 Mich 173, 180; 19 NW 940 (1884):

[53] Plaintiff contends there was insufficient evidence to justify giving an instruction concerning violation of this statute. We cannot agree. In addition to the circumstantial evidence concerning Mr. Hardy's subjective intent with which he removed the cover, Mr. Heim's hearsay statement was introduced into evidence. The statement indicated that Mr. Heim and Mr. Hardy, knowing the plywood cover to be a safety device, purposely removed the cover. This statement was alluded to on seven occasions during trial.

No hearsay objection was offered, nor was a cautionary instruction requested which would have limited the jury's consideration of the statement to assessing Mr. Heim's credibility. Therefore, we cannot conclude that there was insufficient evidence to justify giving this instruction.

"The word 'willfully', when used to denote the intent with which an act is done, is a word which is susceptible of different significations, depending upon the context in which it is used. It is employed in penal statutes more frequently to distinguish between those acts which are intentional and by design and those which are thoughtless or accidental. It may sometimes mean corruptly or unlawfully, or again designedly or purposely, with an intent to do some act in violation of the law. * * * Sometimes it is used as implying an evil intent without justifiable excuse."

For purposes of this statute, we construe the term willful to describe an employee's conduct in purposefully removing a device which the employee realizes or should have realized is a safety device without having a reasonable excuse. Conduct is not purposeful if it is accidental, and intentional conduct is not purposeful if a reasonable worker would not have known both that the device is a safety device designed or emplaced to protect against a peril of injury or death and that the risk of injury or death may result from its removal or alteration.

In the instant case, the trial court erred by failing to distinguish the purposeful conduct described in the statute from action constituting ordinary inadvertence.[54] This error was further exacerbated by incorrectly instructing the jury

[54] The jury was instructed that Mr. Hardy's ordinary negligence constituted a complete defense. The jury was further instructed concerning violation of the statute as follows:

"At the time of Mr. Hardy's accident, we had in this state a statute which provided that no employee shall willfully remove, displace, damage, destroy or carry off any safety device or safeguard furnished or provided for use in any employment or place of employment, or interfere in any way with the use thereof by any other person. If you find that the plaintiff's decedent violated this statute before or at the time of the occurrence, then the plaintiff's decedent was negligent as a matter of law. You must then decide whether such negligence was a proximate cause of the occurrence.

* * *

that violation of the statute, if a proximate cause of the injury, constituted contributory negligence as a matter of law. *Zeni, supra,* 397 Mich 143.[55] Under *Zeni,* plaintiff's violation of the standard would merely give rise to a prima facie case of negligence which could be rebutted.

Accordingly, we hold that it is permissible to instruct a jury concerning a worker's violation of a statutory standard of care where there is sufficient evidence to support the giving of such an instruction, where the statute is designed to prevent the harm which occurred, and where the statutory standard of care is consonant with our holding that the only conduct which may constitute a valid defense to claims that a defendant has breached duties under our *Funk* and *Tulkku* decisions is that in which the worker unreasonably altered, dismantled, or failed to use an adequate safety device. The jury may then be instructed that if they find the plaintiff's violation of such statutory standard of care, unless excused,[56] is a proximate cause of his or her injuries, such violation consti-

"These defendants claim further that the plaintiff's decedent, Robert G. Hardy, knew, or should reasonably have known, that the plywood was covering an opening in the roof. They further claim that he was negligent in removing the cover without looking underneath it, or otherwise using reasonable care to determine whether there was an opening under the plywood cover.

\* \* \*

"It is defendant J & L Roofing's claim that Mr. Hardy may have known of the existence of the hole but simply forgot about it while working there. And they also claim that he may have known it was there because Mr. Cook and Mr. Blake say Mr. Heim told them that he and Mr. Hardy removed the nails from the cover that morning. It is J & L's claim that Mr. Hardy may not have realized the hole was there, but he should have known it through the exercise of reasonable care for his own safety, and that if Mr. Hardy had been reasonably careful he should have known about the hole \* \* \*."

[55] Our decision in *Zeni* was handed down on July 8, 1976. The trial in this case was conducted in 1977. *Zeni* thus controls.

[56] We express no opinion on what may constitute an adequate excuse for violation of the statute in question.

tutes a prima facie case of negligence.[57] *Zeni, su-
pra,* 143. In such instances, where the jury con-
cludes that the plaintiff is responsible for causal
misconduct as outlined above, the plaintiff's negli-
gence may then be compared with the defendant's
negligence. *Placek, supra.*[58]

# VI

## INDEMNIFICATION

Leonard filed a cross-claim against J & L seek-
ing indemnification, or, in the alternative, contri-
bution. Leonard's claim for indemnification was
based upon three theories: J & L's breach of an
express contract of indemnity, common-law indem-
nity, and indemnity arising from breach of certain
contract provisions.

J & L's motions for a directed verdict on Leo-
nard's cross-claim for indemnity were denied.
Since a verdict was rendered in favor of all defen-
dants, the jury made no findings concerning Leo-
nard's indemnity claim. The Court of Appeals
affirmed without addressing issues raised concern-
ing indemnity. J & L filed an application for leave
to appeal as cross-appellant in this Court. J & L
argues that the trial court erred in denying its
motions for directed verdict.

## EXPRESS INDEMNITY CONTRACT

In its cross-claim, Leonard asserted a right to

[57] Of course, if the jury concludes that the plaintiff either did not
violate the statute, or the violation was excused, or plaintiff's conduct
did not proximately contribute to his injury, the jury then considers
the plaintiff's conduct according to common-law principles as outlined
in sections III and IV, *supra.*

[58] The nature of a worker's conduct described in this statute was
alluded to as a possible defense in our *Funk* decision. We now
conclude it is permissible to apply comparative negligence principles
in this limited situation.

indemnity based upon J & L's breach of an express contract of indemnity.

In its contract with Leonard, J & L agreed:

"[T]o indemnify and save Leonard and owner harmless against any and all losses, damages, costs, expenses and liability which Leonard and/or owner may hereafter suffer or pay out by reason of any demands, claims, actions, or rights of action arising out of or related to the performance of the work or arising out of operations under or in connection with the contract and resulting from injuries (including death) or damages occurring to, or caused in whole or in part by, contractor (or his employees), any of his subcontractors (or the employees thereof), or any person, firm or corporation (or the employees thereof) directly or indirectly employed or engaged by either contractor or any of his subcontractors."

The contract further provided:

"This contract shall be construed and any claim or controversy arising with respect thereto, shall be determined in accordance with the laws of the State of Illinois."

On appeal, J & L argues that under Illinois law Leonard is not entitled to indemnity based upon breach of this express indemnity clause for two reasons. First, if the clause is read to indemnify Leonard from its own negligence, the provision is void as against public policy expressed in an Illinois statute governing indemnity agreements in construction contracts.[59]

---

[59] Ill Rev Stat 1971, ch 29, ¶ 61 provides:

"With respect to contracts or agreements, either public or private, for the construction, alteration, repair or maintenance of a building, structure, highway bridge, viaducts or other work dealing with construction, or for any moving, demolition or excavation connected therewith, every covenant, promise or agreement to indemnify or hold

Second, J & L argues that the provision is unenforceable by reason of a rule of contract construction which is applied to indemnity agreements. The rule states that an intent to indemnify against one's own negligence must be clearly and unequivocally expressed. A court will refuse to infer such an intention. *Westinghouse Electric Elevator Co v La Salle Monroe Building Corp,* 395 Ill 429; 70 NE2d 604 (1946). J & L posits that since Leonard could be found liable to plaintiff only by reason of its own active negligence, and the contract provision does not specifically indemnify Leonard from its own negligence, Leonard is not entitled to indemnification under the foregoing rule of contract construction. However, we need not address this question.

In its brief, Leonard concedes that it is not entitled to relief under the express indemnity agreement "if this Court determines that [the contract clause providing that Illinois law is controlling] may be enforced". Leonard further states that J & L had not raised the argument that Illinois law is controlling until leave to appeal was granted by this Court.

Leonard drafted this contract. It cannot now claim surprise concerning the contents of the contract. Further, Leonard has not advanced any argument why the parties' agreement should not be enforced. We therefore conclude that, in accordance with the parties' agreement, Illinois law controls. *Rubin v Gallagher,* 294 Mich 124, 127-128; 292 NW 584 (1940); *Voorheis v The People's Mutual Benefit Society of Elkhart, Indiana,* 91

harmless another person from that person's own negligence is void as against public policy and wholly unenforceable."
The statute was declared constitutional by the Illinois Supreme Court in *Davis v Commonwealth Edison Co,* 61 Ill 2d 494; 336 NE2d 881 (1975).

Mich 469, 473; 51 NW 1109 (1892); *Detroit Grey-hound Employees Federal Credit Union v Aetna Life Ins Co,* 7 Mich App 430, 434, 437; 151 NW2d 852 (1967).[60]

Since Leonard has conceded that under applicable Illinois law it may not enforce an express indemnity provision relating to its own negligence, we consider this claim waived. Thus, there is no need to determine whether J & L's motion for directed verdict should have been granted on this theory.

## COMMON-LAW INDEMNITY

In tort actions, common-law indemnity is an equitable doctrine which developed as an exception to the harsh rule that tortfeasors were not entitled to apportion damages or shift liability between themselves through contribution or indemnification. The instances where common-law indemnification have been deemed appropriate between tortfeasors were outlined by Justice COOLEY in his treatise on torts as follows:

" 'The general rule may be found expressed in the maxim that no man can make his own misconduct the ground for an action in his own favor. If he suffers because of his own wrong-doing, the law will not relieve him. The law cannot recognize equities as springing from a wrong in favor of one concerned in committing it. But there are some exceptions to the general rule which rest upon reasons at least as forcible as those which support the rule itself. They are of cases where, although the law holds all the parties liable as wrong-doers to the injured party, yet as between themselves some of them may not be wrongdoers at all, and their equity to require the others to respond for all the damages may be complete. There are many such cases where the wrongs are unintentional, or where the

---

[60] See also 1 Restatement Conflict of Laws, 2d, § 187, p 561.

party, by reason of some relation, is made chargeable with the conduct of others.' " *Hart Twp v Noret,* 191 Mich 427, 432; 158 NW 17 (1916).

Common-law indemnity has been said to be available to a tortfeasor where liability has been imposed by reason of his or her relationship to another tortfeasor,[61] where liability is imposed simply by operation of law,[62] where the tortfeasor is free from personal fault or causal negligence,[63] or where the tortfeasor seeking indemnity is merely guilty of "passive" negligence.[64]

Leonard claims that the trial judge correctly denied J & L's motions for directed verdict because the jury could have concluded that Leonard was merely passively negligent in failing to discover a dangerous condition created by J & L. Under such a theory, Leonard claims that it would be entitled to indemnity. On the other hand, J & L argues that all theories advanced by Mrs. Hardy involve claims of active negligence on the part of Leonard. Therefore, if the jury rendered a verdict against Leonard, the verdict would be premised on Leonard's own active negligence. Under such circumstances, Leonard would not be entitled to indemnity.

Our Court has previously recognized the distinction of active, as opposed to passive, negligence in suits between tortfeasors seeking indemnity. *Vil-*

---

[61] *Noret, supra,* 432.

[62] *Tahash v Flint Dodge Co,* 399 Mich 421, 427; 249 NW2d 110 (1976).

[63] *Tahash, supra,* 428; *Dale v Whiteman,* 388 Mich 698, 706; 202 NW2d 797 (1972); *Husted v Consumers Power Co,* 376 Mich 41, 51; 135 NW2d 370 (1965); *Indemnity Ins Co of North America v Otis Elevator Co,* 315 Mich 393, 398-402; 24 NW2d 104 (1946).

[64] *Village of Portland v Citizens Telephone Co,* 206 Mich 632, 636; 173 NW 382 (1919); *Detroit, G H & M R Co v Boomer,* 194 Mich 52, 54; 160 NW 542 (1916).

*lage of Portland v Citizens Telephone Co,* 206 Mich 632; 173 NW 382 (1919); *Detroit, G H & M R Co v Boomer,* 194 Mich 52; 160 NW 542 (1916). In the *Portland* case, a young child was severely injured when he came into contact with a fallen electric line. The electric wire was maintained by the Village of Portland. The village had given the defendant telephone company permission to string telephone lines. The lines were negligently installed too close to electric wires. Eventually, the telephone lines, leaning upon the electric wires, caused the electric wires to snap and fall during high winds, injuring the child. The child recovered a judgment against the village and the telephone company.

In its suit seeking indemnification, the village claimed that it was merely passively negligent in failing to discover a dangerous condition created by the telephone company. The Court rejected this contention for two reasons. First, the Court noted that the negligence of the village was active in character. The dangerous condition created in part by the telephone company was known *or could have been discovered by the village through an inspection.* 206 Mich 643. Second, the negligence of the village combined with the malfeasance of the telephone company to cause the child's injury. Since both defendants were guilty of active, causal negligence, indemnity was unavailable.

In *Portland,* the Court discussed in some detail a trilogy of appeals in which indemnity rights were resolved among various parties held liable for a construction site injury. *Grant v Maslen,* 151 Mich 466; 115 NW 472 (1908), *Detroit v Grant,* 135 Mich 626; 98 NW 405 (1904), and *Anderson v Grant,* 114 Mich 161; 72 NW 144 (1897).

In these cases, the city entered into an agreement with a general contractor to complete construction work on a highway. The general contractor sublet all the work to a subcontractor. The subcontractor was negligent in failing to adequately illuminate an excavation.

A motorist was injured when his vehicle fell into the excavation and recovered a judgment against the city. The city obtained indemnity from the general contractor based upon the express indemnification agreement between these parties. In *Portland,* the Court noted that the general contractor had no control over the construction work and was not guilty of active negligence. Therefore, he was granted common-law indemnification from the subcontractor.

Leonard argues that it was possible for the jury to conclude that it was merely guilty of passive negligence. Thereby, Leonard would have made a jury-submissible case for indemnification, and J & L's motion for directed verdict was properly denied. Leonard posits that the covers as initially installed were adequate safety devices, that Leonard's employees made numerous inspections, and that if Mr. Hardy did not remove the nails in the cover, J & L employees must have done so. Thus, the jury could have concluded that J & L's negligence was the primary cause of the accident and that Leonard's only negligence consisted in its failure to discover a dangerous condition created by J & L.

Leonard's argument presupposes that Leonard could be found passively negligent in failing to discover a condition created solely by J & L's negligence. We cannot agree. Leonard could be found negligent only as a result of breach of its

own duty under *Funk*.[65] Such negligence would be active in nature.

Leonard had a duty to supply adequate safety devices. The equipment selected by Leonard to function as safety devices could only be deemed adequate if and when it was properly secured. In such an instance, the "failure to inspect" the covers is intimately connected to Leonard's own duty to provide adequate safety devices.[66] If the jury concluded that Leonard failed to properly inspect the covers or failed to properly instruct J & L concerning procedures to follow in resecuring these covers, such action would constitute active negligence and a breach of Leonard's own duty to supply adequate safety devices.[67]

---

[65] A number of Court of Appeals panels have held that breach of *Funk* or *Funk*-like duties constitute active negligence. See, *e.g., Brown v Unit Products Corp*, 105 Mich App 141; 306 NW2d 425 (1981); *Duhame v Kaiser Engineering of Michigan, Inc*, 102 Mich App 68; 300 NW2d 737 (1980); *Peeples v Detroit*, 99 Mich App 285; 297 NW2d 839 (1980); *Tiffany v Christman Co*, 93 Mich App 267; 287 NW2d 199 (1979); and *Darin & Armstrong v Ben Agree Co*, 88 Mich App 128; 276 NW2d 869 (1979). Contra, see *Nanasi v General Motors Corp*, 56 Mich App 652; 224 NW2d 914 (1974).

[66] In *Johnson v Spear*, 76 Mich 139; 42 NW 1092 (1889), our Court employed the same rationale in an analogous situation. In *Johnson,* we concluded that inherent in the duty to supply safe equipment is the duty to inspect the equipment to assure that the equipment remains safe for use by workmen.

[67] Leonard relies upon two cases in support of its contention that Leonard's negligence, if any, was passive. *Tromza v Tecumseh Products Co*, 378 F2d 601 (CA 3, 1967), and *Continental Casualty Co of Illinois v Westinghouse Electric Corp*, 327 F Supp 723 (ED Mich, 1970).

In both cases, an assembler-manufacturer was permitted to collect indemnification from the manufacturer of a defective component part. Since the component manufacturer created the defect as well as failed to discover the defect, its fault was deemed primary. The only fault on the part of the assembler-manufacturer was its failure to discover the defect.

We find these cases inapposite. In *Continental Casualty,* the defect was deemed to have been "undiscoverable" by the assembler-manufacturer who was granted indemnity. Further, both cases involved a policy judgment that the fault of the component manufacturer, in marketing the defective component, was primary.

In the instant case, both Leonard and J & L were charged with the

Further, Leonard's reasoning in support of its indemnity assertion against J & L would constitute a complete defense to Mrs. Hardy's claims rather than a valid claim for indemnification. The jury could not find Leonard passively negligent for failure to discover a dangerous condition created by J & L, since, under the facts of this case, inspection of the covers was necessary to discharge Leonard's own duty to supply or require the provision of adequate safety devices.

We therefore conclude that, viewing the evidence presented in the light most favorable to Leonard, no valid claim for common-law indemnity based on passive negligence existed to present to the jury. *Caldwell v Fox,* 394 Mich 401, 407; 231 NW2d 46 (1975).[68]

### INDEMNITY BASED ON BREACH OF CONTRACT

Leonard finally claims the right to indemnity based on J & L's breach of its contractual agreement to comply with safety laws and codes.[69] Leo-

duty to provide safety devices. As general contractor and as the entity supplying the safety equipment, Leonard was charged with supplying adequate safety devices. The devices were deemed adequate only when properly secured. Inspection of the covers was necessary to insure the continuing adequacy of the covers as safety devices. Under these circumstances, Leonard's negligence in inspection, if any, could not be said to constitute passive or secondary fault.

[68] While we need not specifically address the subject, it is interesting to note that the active-passive negligence distinction, as a ground supporting common-law indemnification totally relieving a defendant of all responsibility for damages, has been abandoned in Minnesota. The Court concluded that application of comparative negligence principles to tortfeasors' contribution claims operates to more closely apportion damages between tortfeasors according to their relative degree of fault. *Tolbert v Gerber Industries, Inc,* 255 NW2d 362, 367-368 (Minn, 1977).

[69] J & L agreed to:

"take all necessary precautions for the safety of all persons engaged on the work, and [to] comply with all applicable provisions of federal, state and municipal safety laws and building codes to prevent accidents or injuries to persons on, about, or adjacent to the premises where the work is being performed, including the erection, where appropriate, of all necessary safeguards."

nard argues that J & L breached its contractual agreement to comply with safety laws by creating a dangerous condition. Since the jury could impose liability on Leonard for its failure to discover a dangerous condition created by J & L, it is claimed that Leonard should be entitled to indemnity based on J & L's breach of this contract provision.

The cases relied upon by Leonard do not indicate that Illinois recognizes a claim for indemnity based upon this theory. In *Westerfield v Arjack Co, Inc,* 78 Ill App 3d 137; 33 Ill Dec 945; 397 NE2d 451 (1979), the court discussed indemnity only as it relates to the active-passive negligence distinction recognized in claims based upon common-law indemnification. The court in *Nogacz v Procter & Gamble Manufacturing Co,* 37 Ill App 3d 636; 347 NE2d 112 (1975), discussed breach of an express indemnity agreement. Leonard has conceded that it may not recover under its claim for express indemnity under Illinois law.

Finally, *Mosley v Northwestern Steel & Wire Co,* 76 Ill App 3d 710; 31 Ill Dec 853; 394 NE2d 1230 (1979), involved an express indemnity clause where the subcontractor explicitly agreed to indemnify the general contractor for losses incurred by reason of the subcontractor's violation of OSHA regulations. Leonard has waived its claim under the express indemnity provision.

Further, in *Mosley,* the court concluded that under the express indemnity agreement the subcontractor would not be liable to indemnify the general contractor against losses caused by the general contractor's own negligence. We have concluded that under the facts presented Leonard may not be held liable to plaintiff unless it was actively negligent.

It appears, therefore, that Leonard has not pro-

vided authority to show that Illinois recognizes a theory supporting indemnity based upon breach of contract provisions other than those included within the express promise to indemnify. However, since this case must be retried, Leonard is free to present further evidence on the issue and authority to the trial court in support of its position that Illinois recognizes such a theory.

## VII

Plaintiff contends that retrial of this case should be limited to the issue of damages. Plaintiff reasons that a poll of the jury indicated that five of the six jurors found all defendants to have been negligent. Plaintiff urges that while five of the six jurors concluded that plaintiff had been contributorily negligent, this affirmative defense should not have been injected into the case under our decision in *Funk.* Therefore, retrial should be limited to ascertaining plaintiff's damages.

Partial new trials limited to the determination of damages are disfavored in large part because issues relating to liability and damages are often closely intertwined. *Kistler v Wagoner,* 315 Mich 162, 173; 23 NW2d 387 (1946). An exception to this general rule is made in cases where liability is clear. *Trapp v King,* 374 Mich 608; 132 NW2d 640 (1965); *Bias v Ausbury,* 369 Mich 378; 120 NW2d 233 (1963).

Unlike the situation in the *Bias* and *Trapp* cases, the affirmative defense of Mr. Hardy's contributory negligence was very much at issue here. It is unclear from the poll of the jury whether the jury concluded that Mr. Hardy had been negligent because he violated the statute in question or

because he breached common-law duties of care. The jury instructions given concerning Mr. Hardy's violation of the statute failed to distinguish the statutory standard of care from ordinary contributory negligence. Further, in the event a verdict is rendered in favor of plaintiff, Leonard may have the right to have the jury determine its cross-claim for indemnity based upon J & L's breach of contract.

We, therefore, reverse the judgment of the Court of Appeals and would remand the case for a new trial not inconsistent with this opinion.

WILLIAMS and LEVIN, JJ., concurred with BLAIR MOODY, JR., J.